# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THOMAS M. FRANCIS, JR.,

    **Plaintiff,**

    **v.**

DISTRICT OF COLUMBIA, <u>et al.</u>,

    **Defendants.**

Civil Action No. 07-1473 (JDB)

## <u>MEMORANDUM OPINION</u>

Thomas Francis, a former employee of the District of Columbia Office of Property Management ("OPM"), brings this action for reverse discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2, <u>et seq.</u>, and for retaliation pursuant to the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401.01, <u>et seq.</u> He alleges that, as a white male in a predominantly African American agency, he suffered reverse discrimination when the District terminated his employment in 2003. He further alleges that, after he filed an EEO charge, the District retaliated against him in 2007 when he sought reemployment with the District but was not selected for two positions. Before the Court is the District's motion for summary judgment on both counts. Upon careful consideration of the parties' memoranda, the applicable law, and the entire record herein, and for the reasons set forth below, the Court will grant the District's motion.[1]

---

[1] For ease of reference, the Court will refer to defendants' memorandum in support of motion for summary judgment and defendants' reply as "Defs.' Mem." and "Defs.' Reply," respectively, and to plaintiff's opposition to defendant's motion for summary judgment as "Pl.'s Mem." The Court will refer to exhibits attached to the parties' motions as "Defs.' Ex." and Pl.'s Ex." Where both parties have submitted an exhibit, the Court will cite only one.

**BACKGROUND**

Francis began working for OPM in 1999 as head of the Protective Services Division -- a Grade 14 position.  See Pl.'s Ex. 2 at 25 ("Francis Dep.").  In that role, he supervised District and contract law enforcement officers and security guards, and oversaw the facilities and policies pertinent to security.  Id.  In 2000, his job was converted to an at-will Management Supervisory Service ("MSS") position.  See Defs.' Ex. 2 ("MSS Offer and Acceptance").  And in 2002, the position was reclassified from Grade 14 to Grade 15.  See Defs.' Ex. 3 ("Request for Personnel Action").

Around July or August of 2002, Deputy Mayor Herb Tillery, an African American, appointed Marceline Alexander, also an African American, as Chief of Staff of OPM.  See Pl.'s Ex. 7 at 21, 22, 29-35 ("Alexander Dep."); Francis Dep. at 90.  At the time, the "perception of the department as a whole was very, very bad."  Alexander Dep. at 82.  Councilmember Jim Graham was conducting oversight hearings into allegations surrounding OPM's activities.  See id. at 57.  The Director of OPM, Tim Diamond, and the Deputy Director, Michael Lorusso, were suspected of criminal activity.  See id. at 82.  Both eventually left the agency over these events, and Lorusso pleaded guilty to criminal charges for actions taken at OPM.  See id. at 58-59.[2]  After Diamond and Lorusso's departures, Alexander became Acting Director of OPM.  See id. at 21.

On July 14, 2003, Alexander gave Francis notice that his employment was being terminated effective July 29, 2003.  See Defs.' Ex. 6 ("Termination Letter").  The termination was without cause pursuant to his at-will status.  See id.; Francis Dep. at 151.  Although Alexander gave no reason for Francis's termination at the time, she stated in her deposition that she believed

---

[2] The Court takes judicial notice of Lorusso's criminal conviction in United States v. Lorusso, No. 04-CR-00454 (D.D.C. Jan. 29, 2009) (Urbina) (ECF Doc. No. 56, Judgment).

that the office needed to be "reengineered" in order to restore confidence in it. Alexander Dep. at 82, 84-85. She further stated that she made the decision to terminate Francis after hearing numerous allegations about alleged improprieties in which he was involved. See id. at 85. There were, in her words, "too many smoking guns" around him. Id. at 86. These allegations included improper involvement with a contract, failure to report stolen guns, improperly removing guns without signing them out, outfitting personal vehicles with equipment, and taking government vehicles home. See id. at 60-62.

After Francis's termination, his position was advertised at the Grade 15 level. See Defs.' Ex. 7 ("PSM First Vacancy Announcement"). When the search generated few candidates, the position was re-advertised at the Grade 14 level, with the agency stating it was interested in a larger pool of applicants. See Defs.' Ex. 9 ("PSM Second Vacancy Announcement"); Defs.' Ex. 8 ("PSM First Selection Certificate"). On or around December 15, 2003, Plez Jenkins, an African American, was hired from this new pool of applicants. See Defs.' Ex. 11 ("Second Selection Certificate"); Pl.'s First Am. Compl. at ¶ 20. Carol Mitten, a white woman, was the hiring official. See Pl.'s Ex. 9 at 18-19 ("Mitten Dep."). Alexander had left OPM on December 3 or 4, 2003, almost five months after terminating Francis, and was not involved in the decision to hire Jenkins. See Alexander Dep. at 101.

Francis then, for the first time, became suspicious that the District had terminated him with an "agenda" to replace him with an African American. Francis Dep. at 149. On May 20, 2004, he filed a discrimination charge with the EEOC. Defs.' Ex. 13 ("Charge of Discrimination"). Sixteen months later, on September 15, 2005, the EEOC issued a two-page determination summarily concluding that there was cause to believe Francis was terminated based on race. Defs.' Ex. 14 ("EEOC Determination").

In February 2007, over a year after issuance of the EEOC Determination, Francis applied for the position of Risk Management Coordinator (job reference #5881) with OPM. See Defs.' Ex. 17 ("#5881 Vacancy Announcement"); Defs.' Ex. 18 ("#5881 Selection Certificate"). Although Francis was ranked well qualified for the position, he was not selected for the job. See #5881 Selection Certificate. Instead, Sonya Williams, an internal candidate who was also considered well qualified, was chosen on April 20, 2007. Id.

A few months later, in September 2007, Francis applied for another job with the District: Management Analysis Officer (job reference #7779) with the Office of Risk Management. See Defs.' Ex. 16 ("Francis Resume/Application for #7779"); Defs.' Ex. 22 ("#7779 Selection Certificate"). Francis was considered qualified for the position (see #7779 Selection Certificate), but he was not selected for that job either. Instead, Gail Allen, a qualified candidate with substantial insurance management experience, was selected on October 5, 2007. See id.; Defs.' Ex. 23 ("Allen Application").

Francis filed this suit on August 15, 2007, asserting claims under Title VII and the D.C. Human Rights Act based on his termination and defendant's subsequent actions allegedly damaging his professional reputation. Compl., Counts I-VI. On September 28, 2007, Francis sent notice pursuant to D.C. Code § 12-309 of his intent to sue the District of Columbia under the D.C. Human Rights Act for discrimination with respect to his termination and for retaliation with respect to the non-selection decisions. See Defs.' Ex. 25 ("Notice Letter"). Thereafter, on October 22, 2007, he filed his First Amended Complaint refining his discrimination claim (Count I), deleting the earlier retaliation claims concerning his professional reputation, and adding a retaliation claim under the D.C. Human Rights Act based on the non-selections (Count II).

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Crop. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by identifying those portions of "the pleadings, the discovery and disclosure materials on file, and any affidavits" that it believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); see also Celotex, 477 U.S. at 323.

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the Court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. Thus, the non-moving party cannot rely on mere speculation to defeat a motion for summary judgment. See Hutchinson v. Cent. Intelligence Agency, 393 F.3d 226, 229 (D.C. Cir. 2005). Nor can the non-moving party rely on hearsay statements or conclusory statements with no evidentiary basis to establish a genuine issue of material fact. See Assoc. of Flight Attendants v. Dep't of Transp., 564 F.3d 462, 465 (D.C. Cir. 2009). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). Moreover, a moving party may succeed on summary judgment by pointing to the absence of evidence proffered by the non-moving party. See Celotex, 477 U.S. at 322; see also Anderson, 477 U.S. at 252.

# ANALYSIS

## I.  Dismissal of OPM from the Action

"[B]odies within the District of Columbia government are not suable as separate entities" unless statutory authority exists to the contrary.  Braxton v. Nat'l Capital Housing Auth., 396 A.2d 215, 216 (D.C. 1978) (citations omitted).  Sections 10-1001 through 10-1015 of the D.C. Code establish the duties and powers of the Office of Property Management.  None of those provisions grants OPM the authority to sue and be sued.  OPM is therefore non sui juris. Accordingly, the Court dismisses OPM from this action, leaving the District as the sole defendant.

## II.  The Title VII Discrimination Claim

### A.  Timeliness of the Title VII Charge of Discrimination

The District argues that Francis's Title VII discrimination claim should be dismissed as untimely because he filed his EEO charge on May 20, 2004, after the applicable limitations period had expired.  See Defs.' Mem. at 18.  Francis responds that his charge was timely, because the limitations period accrued from the time he had a reasonable suspicion of the alleged injury. See Pl.'s Mem. at 14-15.

With respect to a Title VII claim for employment discrimination, a plaintiff must file an administrative complaint with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1).  However, if the plaintiff "initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice," then the deadline becomes "three hundred days after the alleged unlawful employment practice occurred."  Id.  Moreover, "where a worksharing agreement exists between the EEOC and a local fair employment practices agency," employees have up to 300 days to file

6

pursuant to 29 C.F.R. § 1601.13(a)(4)(ii)(A); <u>Carter v. George Washington Univ.</u>, 387 F.3d 872, 879 (D.C. Cir. 2004) (rejecting employer's contention that a 180-day limitations period applied to plaintiff who had first filed her charge with the EEOC in light of a worksharing agreement with the relevant local agency, and holding that "[s]ince the EEOC had such [a worksharing] agreement with the D.C. Office of Human Rights . . . [plaintiff] had up to 300 days to file [the charge].")

The EEOC and the D.C. Office of Human Rights had a worksharing agreement in effect at the time Francis filed his charge with the EEOC on May 20, 2004, and the EEOC notified the D.C. Office of Human Rights that, pursuant to that agreement, the charge would be initially investigated by the EEOC. <u>See</u> Charge of Discrimination at 1-2. Accordingly, pursuant to 42 U.S.C. § 2000e-5(e)(1) and 29 C.F.R. § 1601.13(a)(4)(ii)(A), the applicable limitations period in this case is 300 days. <u>See Carter</u>, 387 F.3d at 879.

The District contends that, even applying the longer period, Francis's EEO charge still is untimely because the 300 calendar days expired on May 9, 2004 -- before his May 20, 2004 EEO charge was filed.[3] However, the general accrual rule for remedial civil actions in this circuit is the "discovery of injury" rule. <u>Commc'ns Vending Corp. of Ariz., Inc. v. FCC</u>, 365 F.3d 1064, 1074 (D.C. Cir. 2004). "Under that rule, a cause of action accrues either when a readily discoverable injury occurs or, if an injury is not readily discoverable, when the plaintiff should

---

[3] Francis was notified on July 14, 2003 that he would be terminated effective July 29, 2003. The Court calculates the limitations period from the date Francis received the letter of termination, not the date the termination became effective, because the period runs "when the plaintiff is given unequivocal notice of the termination decision, even if one of the effects of the decision -- the eventual loss of the employee's position -- does not occur until later." <u>Powell v. Am. Red Cross</u>, 518 F. Supp. 2d 24, 32 (D.D.C. 2007) (citing <u>Del. State Coll. v. Ricks</u>, 449 U.S. 250, 258 (1980)).

have discovered it." Id. (citing MCI Telecomms. Corp. v. FCC, 59 F.3d 1407, 1417 (D.C. Cir. 1995)). Accordingly, the time for calculating the limitations period runs from the time a Title VII plaintiff develops "a reasonable suspicion of the alleged harm." Johnson v. Holder, 598 F. Supp. 2d 50, 55 (D.D.C. 2009), aff'd, 2010 WL 2162171 (D.C. Cir. 2010).

Francis argues that he had no reason to suspect his termination was discriminatory until he learned that the position he held had been downgraded to the Grade 14 level and offered to Plez Jenkins, allegedly a less qualified African American. See Pl.'s Mem. at 12. Drawing all reasonable inferences in Francis's favor, a reasonable jury could find that there was no basis for Francis to reasonably suspect discrimination until that occurred, since, according to both Francis and Alexander, there were no indicia of discrimination at the time he was terminated in July 2003. See Pl.'s Mem. at 7 (citing Francis Decl. ¶ 13 and Francis Dep. at 149); see also Alexander Dep. at 98; Termination Letter (stating Francis was terminated without cause pursuant to his at-will status). Thus, calculating the 300-day limitations period from November 7, 2003, when the downgraded position was first publicly advertised, see Second Vacancy Announcement at 1, the period did not expire until September 2, 2004, well after Francis filed his charge.

### B. Merits of the Discrimination Charge

In assessing Francis's Title VII discrimination claim, the Court applies the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-07 (1973). Under this framework, a plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence. Id. A plaintiff "makes out a prima facie case of disparate-treatment discrimination by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 850 (D.C.

Cir. 2006) (quoting <u>George v. Leavitt</u>, 407 F.3d 405, 412 (D.C. Cir. 2005)).  In a reverse

discrimination suit, the plaintiff must also show "additional background circumstances that

support the suspicion that the defendant is that unusual employer who discriminates against the

majority." <u>Id.</u> at 851 (quoting <u>Parker v. Balt. & Ohio R.R.</u>, 652 F.2d 1012, 1017 (D.C. Cir.

1981)).

Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to

articulate a legitimate, non-discriminatory explanation for its actions.  <u>See</u> <u>Smith v. Dist. of</u>

<u>Columbia</u>, 430 F.3d 450, 455 (D.C. Cir. 2005).  In asserting a legitimate, non-discriminatory

explanation, an employer "need not persuade the court that it was actually motivated by the

proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to

whether it discriminated against the plaintiff." <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S.

248, 254 (1981) (citations omitted).

If a defendant offers a legitimate, non-discriminatory reason for its actions "the district

court need not -- <u>and should not</u> -- decide whether the plaintiff actually made out a prima facie

case under <u>McDonnell Douglas</u>." <u>Brady v. Office of Sergeant at Arms</u>, 520 F.3d 490, 494 (D.C.

Cir. 2008) (emphasis in original).  Rather, the sole inquiry becomes "whether the plaintiff

produced sufficient evidence for a reasonable jury to find that the employer's asserted non-

discriminatory reason was not the actual reason and that the employer intentionally discriminated

against the plaintiff on a prohibited basis." <u>Adeyemi v. Dist. of Columbia</u>, 525 F.3d 1222, 1226

(D.C. Cir. 2008).  "Whether judgment as a matter of law is appropriate in any particular case will

depend on a number of factors.  Those include the strength of the plaintiff's prima facie case, the

probative value of the proof that the employer's explanation is false, and any other evidence that

supports the employer's case and that properly may be considered on a motion for judgment as a

matter of law." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148-49 (2000); accord Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc); see also Waterhouse v. District of Columbia, 298 F.3d 989, 992-993 (D.C. Cir. 2002).

In other words, the McDonnell Douglas shifting burdens framework effectively evaporates, and the only question is "the ultimate factual issue in the case -- discrimination vel non." Jones v. Bernanke, 557 F.3d 670, 678 (D.C. Cir. 2009) (citation omitted). "[T]o survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003); see Reeves, 530 U.S. at 142-43.

Under the circumstances of this case, the Court will assume without deciding that Francis has established a prima facie case of discrimination. This is because two of the prima facie elements -- whether there are "background circumstances" that show the District discriminates against whites and whether the evidence supports an inference of discrimination -- are inextricably intertwined with the ultimate question of discrimination vel non on the entire record. In other words, the assessment of the prima facie case and the question whether a reasonable jury could find discrimination in light of the employer's proffered non-discriminatory reason are the same. See Defs.' Mem. at 21-25 (making the same arguments concerning Francis's alleged failure to establish a prima facie case, the proffered legitimate non-discriminatory reason for termination, and discrimination vel non). Hence, the Court is to "focus on the key question of discrimination without slogging through the McDonnell Douglas prima facie factors." See Adeyemi, 525 F.3d at 1226. The Court therefore moves to the second step of the McDonnell Douglas framework.

The District has proffered a legitimate, non-discriminatory reason for terminating Francis

-- that he was terminated based on the "allegations and investigations into misconduct and improprieties by the plaintiff, which were compounded by the surrounding investigation into OPM by Councilmember Graham and the FBI." Defs.' Mem. at 25. Accordingly, the Court looks to the totality of the evidence in the record to determine whether a reasonable jury could conclude, instead, that the District terminated Francis because of his race. This examination takes place, of course, in the context of termination of an at-will employee subject to removal without cause.

The District offers specific evidence supporting its claim that Francis was terminated due to the cloud of allegations surrounding him. Marceline Alexander was primarily responsible for initiating Francis's termination. See Alexander Dep. at 50. She consulted with Deputy Mayor Tillery and Judy Banks, the Interim Director of Personnel, in effectuating the termination. See Pl.'s Ex. 4 at ¶ 2 ("Defs.' Supp. Resp. to Pl.'s First Set of Interrogatories"). Although Alexander gave Francis no reasons for her decision at the time, she described the underlying reasons at her deposition.

When she entered OPM as Chief of Staff, Councilmember Graham was conducting oversight hearings into allegations surrounding the office, and "the perception of the department as a whole was very, very bad." Alexander Dep. at 82. In particular, Director Tim Diamond and Deputy Director Michael Lorusso were suspected of criminal activity. See id. Lorusso in fact later pleaded guilty to criminal offenses relating to OPM. See id. at 57. Diamond departed over the allegations. See id. at 58. The Chief Procurement Officer, similarly, resigned over issues involving OPM's use of credit cards. See id. at 61. Alexander stated that, as Acting Director of OPM, she believed that, in light of those circumstances, "the only way that the administration was going to be able to restore confidence was for the office to be reengineered." Id. at 84.

She terminated Francis without cause on the grounds that he was at-will and it was the "most expeditious way." Id. at 98. But she elaborated that she reached her decision because there were "too many smoking guns" around him. Id. at 86. In particular, she heard allegations about him that included improper involvement with a contract, failure to report stolen guns, improperly removing guns without signing them out, outfitting personal vehicles with equipment, and taking government vehicles home. See id. at 60-62.[4]

Benita Anderson of Human Resources corroborated the existence of these rumors. For example, when asked at deposition if she was surprised that Francis was fired, she said she was not because of the "[p]erceptions of Mr. Francis" and "things that people said that he was doing." See Pl.'s Ex. 8 at 36-37 ("Anderson Dep."). She said, "I heard enough that people had said about him. . . . Rumors like he was buying things with OPM money and taking them home." Id. Moreover, she stated, "I wasn't the only one hearing those rumors, and the director knew what was going on." Id. at 39. Similarly, an employee who worked under Francis, Teala Brewer, offered deposition testimony that there was a reasonable factual basis for believing several of the incidents in fact occurred. See Defs.' Ex. 27 ("Brewer Dep."). For example, she offered evidence that Francis took weapons home (id. at 21); described instances where she believed he used funds inappropriately (id. at 40-47); claimed he took government vehicles home (id. at 58); and gave examples where he mischaracterized his position to salespeople (id. at 79-85).

---

[4] The District also refers to allegations that Francis made misrepresentations on his resume. See Defs.' Mem. at 7-8; see also Anderson Dep. at 36 (stating that she heard "[r]umors like his resume wasn't all fact"). Although Francis does not directly dispute this rumor, Alexander offers inconsistent testimony as to whether she learned of this allegation prior to or after terminating Francis. See Alexander Dep. at 46-47. This matter is not material to whether summary judgment is appropriate, and therefore the Court need not resolve it.

Despite the substantial evidence supporting the District's justification, Francis contends that the justification is mere pretext disguising racial discrimination. A plaintiff may establish pretext "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Tex. Dep't of Cmty. Affairs, 450 U.S. at 256 (citation omitted). But it is not enough to "show that a reason given for a job action is not just, or fair, or sensible. He must show that the explanation given is a phony reason." Fischbach v. Dist. of Columbia Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (citation omitted). "[T]he issue is not 'the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers.'" Id. (quoting McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368, 373 (7th Cir. 1992)). Moreover, "[t]he more valid a reason appears upon evaluation, the less likely a court will be to find that reason pretextual." Ryan v. Reno, 168 F.3d 520, 524 (D.C. Cir. 1999) (quoting Brazil v. United States Dep't of Navy, 66 F.3d 193, 197 (9th Cir. 1995)). Considering the record in its entirety, the Court finds that no reasonable jury could find pretext based on Francis's proffer of evidence.

Francis does not contest the existence of the rumors and allegations, but claims that the District offers no evidence of their truth and that Alexander never investigated them. See Pl.'s Mem. at 22-23. But even assuming the rumors were neither true nor adequately investigated -- a matter that Francis has not established[5] -- Francis offers no evidence to refute Alexander's testimony that the rumors created a cloud of suspicion around Francis and OPM. Had the rumors ultimately been proven false, that would do nothing to discredit Alexander's statement that she

_____

[5] Alexander states that she both ordered an investigation of the contract and spoke to Francis directly. See Alexander Dep. at 67, 72-79.

terminated Francis because of them. In essence, Francis's argument amounts to a claim that the termination decision was unfair or wrong. But although Francis might well have done nothing inappropriate, "Title VII protects against discriminatory decisions, not wrong ones." <u>Hairsine v. James</u>, 517 F. Supp. 2d 301, 308-09 (D.D.C. 2007).

Similarly, Francis's positive performance evaluations from 2001 and 2002 are not evidence of pretext. <u>See</u> Pl.'s Mem. at 20. To be sure, a plaintiff can also create an inference of discrimination by showing that she was not terminated for "performance below the employer's legitimate expectations." <u>Mastro</u>, 447 F.3d at 850-51. However, strong past performance is not inconsistent with the District's assessment that Francis was no longer the right person for the job in light of the rumors. Moreover, the District has never taken the position that he was fired on the basis of deficient performance. His performance was irrelevant to the District's proffered reason for firing him -- namely, the cloud of suspicion created by the allegations of improper conduct.

Francis further claims that the District's justification is pretextual because the District never stated misconduct as the reason for his termination until Alexander's deposition. <u>See</u> Pl.'s Mem. at 23. Alexander initially told him that his termination was "not for cause" and gave no reasons for her decision. <u>See</u> Pl.'s Ex. 1 at ¶ 11 ("Francis Decl.").[6] The District similarly made no statements regarding Francis's conduct at the EEOC proceedings or in its responses to plaintiff's interrogatories, instead referring more broadly to his status as a Management

---

[6] The District moves to strike ¶ 12 of Francis's declaration as well as Attachment E of his opposition, because they refer to and describe correspondence not produced during discovery. Defs.' Reply at 11. The Court finds no need to resolve this issue because, even with consideration of that material, the District is entitled to summary judgment.

Supervisory Service employee who "served at the pleasure of the Director of OPM.[7]  See EEOC Determination at 1; Pl.'s Ex. 3 at ¶ 2 ("Defs.' Resp. to Pl.'s First Set of Interrogatories"); Defs.' Supp. Resp. to Pl.'s First Set of Interrogatories at ¶ 2.

Of course, a plaintiff can meet his burden of proving pretext with evidence that "the employer's explanation was fabricated after the fact by showing that it contradicts other contemporaneous accounts of the employer's decision." Aka, 156 F.3d at 1295.  But here, Alexander's later statements are consistent with a decision to fire him without cause.  And there is no conflict between Alexander's subsequent explanation and the position that Francis was terminated without cause as an at-will employee, as stated in interrogatory responses.  An employer need not explain its reasons for firing an at-will employee without cause.  That it eventually does so during discovery does not establish pretext.  See Bennett v. Chertoff, 425 F.3d 999, 1002-03 (D.C. Cir. 2005) ("[T]he fact that the termination letter . . . stated unsuitability as the reason for . . . termination is not inconsistent with termination on the basis that [plaintiff] could not sustain a security clearance.").

Nor is Francis's evidence that OPM did not comply with its procedures for terminating an MSS employee sufficient to establish pretext.  See Pl.'s Mem. at 21.  To be sure, an "employer's failure to follow established procedures or criteria" can be grounds for finding pretext in some

---

[7]  Francis does not contend that the EEOC Determination of "reasonable cause" to find discrimination binds the Court, nor could he.  It is well established that an EEOC determination does not have any binding effect in a collateral Title VII civil action.  See Scott v. Johanns, 409 F.3d 466, 469 (D.C. Cir. 2005).  More significantly, the EEOC Determination is so unpersuasive and conclusory that, even if it could properly be admitted into evidence, no reasonably jury could find discrimination based on the Determination.  The finding, on its face, is based solely on the District's decision to fire Francis without supplying an explanation (which was consistent with his at-will status) and filling the position with an African American employee.  See EEOC Determination at 1.  The EEOC cited no other evidence to support its conclusion that the District acted with discriminatory motive.  Hence, it does not alter this Court's analysis.

circumstances.  Brady, 520 F.3d at 495 n.3.  But "[a]n employer's failure 'to follow its own regulations and procedures, alone, may not be sufficient to support' the conclusion that its explanation for the challenged employment action is pretextual."  Fischbach, 86 F.3d at 1183 (quoting Johnson v. Lehman, 679 F.2d 918, 922 (D.C. Cir. 1982)).

Here, Francis presents insufficient evidence to demonstrate that there were "established procedures or criteria" that OPM should have followed in effectuating his July 2003 termination. He offers a statement by Benita Anderson that a termination action ordinarily should go through the head of the DCHR -- as she puts its, "[a]t least that was my understanding" -- and a similar statement by Leah Treat, an OPM Chief of Staff hired four years after his termination.  See Anderson Dep. at 21; Pl.'s Ex. 10 at 4, 54-60 ("Treat Dep.") (setting forth her "understanding" of how a termination would work where performance was an issue).  Those statements fail to demonstrate that, at the time of Francis's termination in 2003, there was a departure from "established procedures" for an at-will employee suspected of malfeasance (not poor performance).  Even assuming that there had been such a departure, moreover, no reasonable jury could find that the alleged departure from procedure establishes pretext in light of the undisputed cloud of suspicion surrounding Francis's activities.

Francis further contends that the District's explanation is pretextual because neither Alexander nor her successor, Mitten, fired anyone except Francis, suggesting that no "reengineering" in fact occurred.  See Pl.'s Mem. at 21-22.  However, as the District notes, Francis "fails to consider that the reengineering of OPM was the removal of Director Tim Diamond, Deputy Director Michael Lorusso, and himself from the leadership of OPM."  Defs.' Reply at 18.  Moreover, to the extent Francis suggests he was treated differently than similarly situated African American employees, he fails to supply evidence to support this contention.

Evidence of disparate treatment requires that "all the relevant aspects of [the plaintiff's] employment were 'nearly identical' to those" not removed. Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO, 548 F.3d 137, 145 (D.C. Cir. 2008) (citations omitted). Francis has not shown that another employee was similarly situated, and therefore he cannot establish pretext on this basis.

His claim that he was one of only nine white employees out of a total of 189 is similarly unpersuasive. This statistic does not shed light on whether whites were treated less favorably than African Americans because it fails to indicate how many whites applied for positions at OPM relative to how many were hired. See Hunter v. Rice, 480 F. Supp. 2d 125, 136 (D.D.C. 2007). Nor does it show that white employees were terminated more often than similarly situated African Americans.

Francis also offers as evidence the allegedly "bizarre facts surrounding the selection of Mr. Francis's replacement." Pl.'s Mem. at 23-24. First, OPM downgraded the Protective Services Manager position from Grade 15 to Grade 14 -- the position's grade level when Francis first assumed it -- and eventually offered it to Plez Jenkins. See PSM First Vacancy Announcement; PSM Second Vacancy Announcement; Second Selection Certificate; Request for Personnel Action. Jenkins was an African American who could not have qualified for the position had it remained at Grade 15 because he previously held only a Grade 13 position. See Pl.'s First Am. Compl. at ¶¶ 20-22. Second, Deputy Mayor Tillery, who participated in the decision to terminate Francis, advised Carol Mitten to offer the job to Jenkins. Mitten Dep. at 18-19. Francis states that this pattern of events shows that his supervisors had an "agenda" and "were looking to hire a specific person for that job and I was in the way." Francis Dep. at 149.

Even if the District terminated Francis to give the job to a pre-selected replacement, "[p]reselection . . . does not violate Title VII when such preselection is based on the qualifications of the party and not on some basis prohibited by Title VII." Nyunt v. Tomlinson, 543 F. Supp. 2d 25, 39 (D.D.C. 2008) (citations omitted). In this jurisdiction, "a plaintiff can directly challenge [a] qualifications-based explanation only if the plaintiff was 'significantly better qualified for the job' than those ultimately chosen." Adeyemi, 525 F.3d at 1227 (quoting Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006)) (emphasis in original).[8]

Construing the record in the light most favorable to Francis, no reasonable jury could find Jenkins unqualified for the position of Protective Services Manager, nor could it find Francis significantly better qualified. To be sure, Jenkins's prior position was at Grade 13 compared with Francis's Grade 15 position. But in all other respects Jenkins was similarly qualified. He served as the Director of Public Safety for the District of Columbia Public Library, where he developed and implemented security programs and supervised a workforce of union personnel. See Pl.'s Ex. 8, Attachment 7, at 4 ("Jenkins Resume"). Prior to holding that position, his jobs included Provost Marshal for the First Calvary Division in Fort Hood, Texas, which entailed supervising 275 security personnel and developing security plans. See Jenkins Resume at 5. In one respect, Jenkins was more qualified than Francis: he held a B.A. in law enforcement and an M.S. in administration (see id. at 7), whereas Francis held no university degree. See Pl.'s Resp. Defs.' Stat. of Facts at ¶ 26. Moreover, Jenkins's resume shows that he held a supervisory military position as early as 1987 (see Jenkins Resume at 7), whereas the earliest position on Francis's

---

[8] The Court sees no difference analytically between assessing the comparative qualifications of (1) and unsuccessful applicant and a selectee, or (2) a terminated employee and the selectee chosen competitively to replace him.

resume dates from 1988.  <u>See</u> Francis Resume/Application for #7779, at 3.[9]  Accordingly, on the basis of the record evidence, a reasonable trier of fact could not find that Francis was significantly better qualified than Jenkins.

Importantly, Alexander, who was primarily responsible for initiating the termination, was not involved in the decision to hire Jenkins.  She left the Department by early December 2003, and knew nothing about either the reclassification of the position from Grade 15 to 14 or how Jenkins came to be selected.  <u>See</u> Alexander Dep. at 101.  It was Carol Mitten who hired Jenkins on or around December 15, 2003.  <u>See</u> Mitten Dep. at 18-19; Second Selection Certificate. Hence, Francis's contention of pretext or discrimination is further weakened by the difference in the personnel ultimately responsible for each action.

In short, Francis has challenged the District's proffered nondiscriminatory reason for his termination as pretextual on several grounds, but each contention falls far short of suggesting pretext. The Court has also considered whether the events, collectively, suggest pretext or underlying discrimination, and concludes that the evidence, taken in the light most favorable to Francis, cannot reasonably be construed to support such a finding.  Indeed, Francis himself admits that until OPM hired Jenkins, "he had no reason to suspect that his termination was due to reverse discrimination . . . since by all accounts and to all appearances, the District had simply decided to replace him without cause."  Pl.'s Mem. at 7.  In other words, Francis admits that there was no indicia of discrimination in the events immediately surrounding his termination.  And as discussed above, the hiring of Plez Jenkins later in 2003 does not suffice to indicate

---

[9] Even if Jenkins ultimately resigned from the position of Chief at OPM because the job proved "too much for him" (Pl.'s Mem. at 6, quoting Anderson Dep. at 81), the Court "must beware of using 20/20 hindsight."  <u>Fischbach</u>, 86 F.3d at 1183.  Rather, it looks to the operative moment when Jenkins was hired.

discrimination, nor do the other background circumstances alleged by Francis. Furthermore, Francis has failed to refute the District's evidence of the cloud of suspicion that hung over senior management at OPM and, in particular, the existence of rumors of improprieties by Francis. Considering the evidence as a whole, then, the Court concludes that on this record no reasonable jury could find that race was a factor in the District's decision to terminate Francis.[10] Accordingly, the District's motion for summary judgment on the Title VII discrimination claim will be granted.

### III. The D.C. Human Rights Act Retaliation Claim

Francis also brings two retaliation claims under the DCHRA based on the District's decision not to hire him years later when he applied for positions #7779 (Management Analysis Officer) and #5881 (Risk Management Coordinator). The District contends that the first retaliation claim should be dismissed for failure to comply with the mandatory pre-suit notice provision of D.C. Code § 12-309. See Defs.' Mem. at 15-17. The District further contends that summary judgment is appropriate on the merits of both retaliation claims because no reasonable trier of fact could find on this record that Francis's EEO activities were the cause of his non-selection. See Defs.' Mem. at 25-29. The Court addresses each argument below.

---

[10] Francis's First Amended Complaint indicates that he brings this case as a single-motive case under 42 U.S.C. §§ 2000e-2(a). See First Am. Compl. at ¶ 38 ("Defendants [acted] in order to discriminate against plaintiff on account of his race . . . .") and ¶ 41 ("In taking the foregoing actions and discriminating against plaintiff on account of his race, defendants violated . . . 42 U.S.C. § 2000e-2."). However, his brief suggests that he also intends to pursue a mixed-motive theory pursuant to 42 U.S.C. § 2000-2(m). See Pl.'s Mem. at 16-19 (citing Ginger v. Dist. of Columbia, 527 F.3d 1340, 1345 (D.C. Cir. 2008)). Assuming arguendo that his complaint adequately pleads a mixed-motive claim, the District is nevertheless entitled to summary judgment for the reasons stated above. On this record, no reasonable jury could find that race was even a motivating factor in the District's decision to terminate Francis.

## A.     Pre-Suit Notice under D.C. Code § 12-309

The Court turns first to the District's threshold argument that the first retaliation claim is

barred for failure to comply with the pre-suit notice requirement.  Section § 12-309 provides that:

> An action may not be maintained against the District of Columbia for unliquidated
> damages to person or property unless, within six months after the injury or
> damage was sustained, the claimant, his agent, or attorney has given notice in
> writing to the Mayor of the District of Columbia of the approximate time, place,
> cause, and circumstances of the injury or damage.  A report in writing by the
> Metropolitan Police Department, in regular course of duty, is a sufficient notice
> under this section.

D.C. Code § 12-309 (emphasis added).[11]  Compliance with this requirement is "mandatory as a

prerequisite to filing a suit against the District" and is to be narrowly construed against the

claimant because it represents a waiver of sovereign immunity.  Dist. of Columbia v. Arnold &

Porter, 756 A.2d 427, 436 (D.C. 2000) (quoting Hardy v. Dist. of Columbia, 616 A.2d 338, 340

(D.C. 1992)).[12]

Francis sent a letter to the Mayor on September 28, 2007, informing the District of his

retaliation claims arising from non-selection for positions #7779 and #5881.  See Notice Letter.

The letter stated that "[a]lthough the District has never responded to Mr. Francis' applications for

the foregoing positions, he has recently learned that both positions have since been filled with

other candidates."  Id. at 2.  The District contends that the letter provides insufficient notice as to

---

[11] The District of Columbia Court of Appeals has recently held that D.C. Code § 12-309 applies
to claims under the DCHRA.  See Owens v. Dist. of Columbia, 993 A.2d 1085, 1089 (D.C.
2010); accord Faison v. Dist. of Columbia, 664 F. Supp. 2d 59, 65 (D.D.C. 2009); Byrd v. Dist.
of Columbia, 538 F. Supp. 2d 170, 175-76 (D.D.C. 2008); Kennedy v. Dist. of Columbia Gov't,
519 F. Supp. 2d 50, 57 (D.D.C. 2007).

[12] "The requirement of prompt notice was designed to enable District officials to make a prompt
investigation before evidence was lost or witnesses become unavailable, to correct potentially
hazardous conditions, and to settle meritorious claims."  Wharton v. Dist. of Columbia, 666 A.2d
1227, 1230 (D.C. 1995) (citations omitted).

position #7779 (Management Analysis Officer) because Francis had not yet suffered an injury. See Defs.' Mem. at 16-17. This is because the position was not filled until the following week, on October 5, 2007, and indeed, Francis still appeared on the selection certificate for the job on October 4. Hence, the District argues that the injury had not yet occurred when Francis sent his letter on September 28, 2007. See id. at 17; #7779 Selection Certificate.

The plain language of § 12-309 controls the resolution of this issue. Notice must occur "within six months after the injury or damage was sustained." D.C. Code § 12-309 (emphasis added). But here, Francis sent his letter before the injury -- i.e., his non-selection -- occurred. "[T]he District certainly was not put on notice of a claim that did not yet exist." Kennedy v. Dist. of Columbia Gov't, 519 F. Supp. 2d 50, 58 (D.D.C. 2007) (holding that plaintiff failed to comply with § 12-309 when plaintiff sent a notice letter that did not mention an injury because it had not yet occurred).

To be sure, there may be a theoretical possibility that Francis had been eliminated from consideration for the job prior to sending the notice letter. But, if so, Francis has not carried the burden of proving it. His only evidence is his statement that he "learned" from some unknown person that both positions had been "filled with other candidates." Notice Letter at 2. But the information provided by that unknown person is inadmissible hearsay. Hearsay evidence is inadmissible unless it falls within a statutory exception. See Greer v. Paulson, 505 F.3d 1306, 1315 (D.C. Cir. 2007). "[O]n summary judgment, statements that are impermissible hearsay or that are not based on personal knowledge are precluded from consideration by the Court." Riggsbee v. Diversity Servs., Inc., 637 F. Supp. 2d 39, 46 (D.D.C. 2009) (citing Greer, 505 F.3d at 1315). Hence, on this record, the evidence shows only that Francis was injured on October 5, 2007, when the District selected another applicant for the job he sought. Because Francis's notice

letter was submitted before that injury, it is insufficient under the plain language of § 12-309. Accordingly, the District is entitled to summary judgment with respect to the portion of Francis's retaliation claim pertaining to position #7779.

### B. Merits of the Retaliation Claims

The Court next turns to the merits of the retaliation claims. The District moves for summary judgment on the merits with respect to the remaining non-selection decision (#5881), and also seeks summary judgment on the merits with respect to #7779 as an additional basis for summary judgment. The familiar burden-shifting framework set forth in McDonnell Douglas applies to retaliation claims under the DCHRA. See Howard Univ. v. Green, 652 A.2d 41, 45 n.3 (D.C. 1994). Under this framework, the plaintiff must first establish a prima facie case by a preponderance of the evidence. McDonnell Douglas Corp., 411 U.S. at 802. To establish a prima facie case of retaliation under the DCHRA, a plaintiff must show: (1) that she was engaged in a protected activity, or that she opposed practices made unlawful by the DCHRA; (2) that the employer took an adverse personnel action against her; and (3) that a causal connection existed between the two. Howard Univ., 652 A.2d at 45. If a plaintiff fails to establish one of those elements, the "entire claim fails." Id. Furthermore, as under Title VII, in determining whether judgment as a matter of law is appropriate in any particular case, the Court must consider the employer's legitimate non-retaliatory reason for the adverse action and, ultimately, whether the plaintiff has "offered sufficient evidence for a reasonable jury to find that retaliation . . . actually motivated the employer's decision." See Hamilton v. Howard Univ., 960 A.2d 308, 314 (D.C. 2008) (citations omitted).

## 1. The Prima Facie Case

The District concedes that Francis engaged in protected activity by filing his EEO charge and assumes for this motion that non-selection for an open position constitutes adverse personnel action. Defs.' Mem. at 26. However, the District argues that Francis cannot show a causal connection between his EEO charge and the adverse actions at issue because too much time passed between his EEO activity and the non-selection decisions. <u>See</u> <u>id.</u> In response, Francis alleges that Leah Treat knew of his claims against the District at the time she made her selection decision for position #5881 on April 20, 2007, and therefore an inference of causation can be drawn. <u>See</u> Pl.'s Mem. at 25.[13] He does not discuss whether the hiring official for #7779 knew of his protected activity when he made his hiring decision in October 2007.

A "causal connection . . . may be established by showing that the employer had knowledge of the employee's protected activity, and the adverse . . . action took place shortly after that activity." <u>Rochon v. Gonzales</u>, 438 F.3d 1211, 1220 (D.C. Cir. 2006) (quoting <u>Mitchell v. Baldridge</u>, 759 F.2d 80, 86 (D.C. Cir. 1985)). In other words, where a causal connection is based on the employer's knowledge of the plaintiff's protected activity, temporal proximity is also required. Although Francis claims that a plaintiff may establish a causal connection by evidence other than temporal proximity, he has offered no such evidence. <u>See</u> Pl.'s Mem. at 10-11 n.5. Hence, the Court looks to whether temporal proximity, in combination with the employer's knowledge, is sufficient to support an inference of a causation.

---

[13] Francis characterizes Treat's "knowledge" as awareness of his having sued OPM. <u>See</u> Pl.'s Mem. at 25. But it is factually impossible that Treat knew of this lawsuit in February of 2007 because Francis had not filed or given notice of suit at that time. Hence, the Court will assume that Francis means to refer to Treat's knowledge of his EEO activity.

As to position #5881 (the Risk Management Coordinator position in OPM), Francis has proffered evidence indicating that the selecting official -- Leah Treat -- knew of his EEO activity, but he is unable to show causation through a temporal connection because the non-selection took place over a year after his last protected EEO activity. For temporal proximity to support an inference of retaliation, the events must be "very close." See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (per curiam). This Circuit has found that gaps as small as "two and one-half months. . .would be untenable" for the purpose of establishing causation. Taylor v. Solis, 571 F.3d 1313, 1322 (D.C. Cir. 2009); see also Hammond v. Chao, 383 F. Supp. 2d 47, 59 (D.D.C. 2005) ("Although plaintiff's supervisor . . . was aware of the plaintiff's . . . EEOC complaint . . . the year-and-a-half gap is too great to permit temporal proximity alone to establish a causal connection.") (citations omitted). Here, well over a year separates the date of the EEOC Determination (the last recorded EEO activity) on September 15, 2005, and the date of his non-selection for #5881 on April 20, 2007. See #5881 Selection Certificate. Therefore, the Court holds that Francis has failed to demonstrate a causal connection between his EEO activity and his non-selection for position #5881.

A timeline more favorable to Francis underlies the non-selection for position #7779, a Management Analysis Officer position with the Office of Risk Management (an agency separate from OPM). But even here, Francis fails to prove a causal connection. He filed this lawsuit against the District on August 15, 2007, asserting claims under Title VII and the D.C. Human Rights Act, and the non-selection occurred on or about October 5, 2007. Hence, the proximity between the Title VII activity and the adverse action is much closer -- about seven weeks. But Francis has offered no evidence that the selecting official in the Office of Risk Management knew that this lawsuit against the District and OPM had been filed. See Pl.'s Mem. at 25.

Furthermore, there is no basis for the Court to presume that the selecting official knew of the lawsuit, especially considering that the Office of Risk Management was not accused of wrongdoing in the complaint filed on August 15, 2007.[14] Hence, the absence of any evidence of employer knowledge of relevant protected activity defeats the causal connection assertion. Accordingly, the District is entitled to summary judgment on both non-selection claims because Francis has not established an essential prima facie element of retaliation -- a causal connection between any of his protected EEO activity and the non-selections for positions #5881 or #7779.

### 2. Assessment of the District's Legitimate Non-retaliatory Reason and Pretext

Assuming arguendo that Francis has established a prima facie case of retaliation for each non-selection, there is an independent ground for entering summary judgment for the District. The District has produced a legitimate non-retaliatory reason for each non-selection action, and Francis has failed to offer evidence from which a reasonable jury could find those reasons to be pretext for retaliation.

### a. Position #5881

The District offers the following legitimate, non-retaliatory reason for selecting Sonya Williams rather than Francis for position #5881 (Risk Management Coordinator) -- she was an internal candidate working in risk management under the supervision of Leah Treat and was a "known quantity." Defs.' Mem. at 29 (citing Treat Dep. at 29). As evidence that the District's reason is pretext, Francis argues that he was more qualified than Williams and that he was given rankings that were patently too low during the selection process. See Pl.'s Mem. at 25.

---

[14] Indeed, the allegations against the Office of Risk Management came only after that agency made its non-selection decision, which was then incorporated into Francis's First Amended Complaint on October 22, 2007.

The relevant question, of course, is not whether Francis was qualified, but whether he was significantly better qualified than Williams. Courts do not serve as "a super-personnel department that reexamines an entity's business decisions." Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (citation omitted). Accordingly, "a plaintiff can directly challenge [a] qualifications-based explanation only if the plaintiff was 'significantly better qualified for the job' than those ultimately chosen." Adeyemi, 525 F.3d at 1227 (quoting Holcomb, 433 F.3d at 897) (emphasis in original).

Francis contends that he was more qualified than Williams based primarily on his previous performance of the requirements of the position while serving as Chief of the Protective Services Division from 1999-2003. See Pl.'s Mem. at 25. But his own prior performance, by itself, does not show that he was significantly better qualified than Williams. With respect to Williams, Francis has offered very little. The record shows only that Williams was a Grade 12 management analyst employed at OPM at the time of the April 2007 selection, with job functions split equally between risk management and management support in the Office of the Director. See Treat Dep. at 30. This evidence -- and, in particular, the lower grade level -- is not sufficient to show that Francis was "significantly better qualified" than Williams. As this Circuit has explained, "the applicants' relative grade levels at the time of the application are irrelevant, for 'it says little about the level of relative . . . qualifications to serve.'" Barnette v. Chertoff, 453 F.3d 513, 517 (D.C. Cir. 2006) (citing Stewart v. Ashcroft, 352 F.3d 422, 429 (D.C. Cir. 2003)). Furthermore, Francis has produced no additional information about Williams' qualifications to assist in the comparative inquiry. Hence, he has not carried the burden of showing that he was

significantly better qualified.[15]

Francis's contention that he should have received higher scores from Treat in the ranking factors is similarly insufficient to establish an inference of retaliation. See Pl.'s Mem. at 25; Pl.'s Ex. 8, Attachment 14, at 5 ("Rankings"). "Evidence indicating that an employer misjudged an employee's performance or qualifications is, of course, relevant to the question whether its stated reason is a pretext masking prohibited discrimination . . . ." Fischbach, 86 F.3d at 1183 (citation omitted). But even assuming that Francis should have received better scores, he offers nothing to suggest that Williams did not deserve the scores she received. Where both applicants are qualified, "liability cannot rest solely upon a judge's determination that an employer misjudged the relative qualifications of admittedly qualified candidates." Id. (citing Ramey v. Bowsher, 915 F.2d 731, 735 (D.C. Cir. 1990)). In short, no reasonable jury could find on this record that the District's explanation is pretext for retaliation. Indeed, when one considers the long period of time -- 18 months -- that had passed between the last action on Francis's EEO charge (the EEOC decision in September 2005) and the non-selection (April 2007), a contrary conclusion would be untenable.

### b. Position #7779

The District also offers a legitimate, non-retaliatory reason for not selecting Francis for position #7779 (Management Analysis Officer) -- Gail Allen was selected for the position because she was more qualified than Francis. Defs.' Mem. at 28. In response, Francis offers evidence that allegedly shows his qualifications were superior to Allen's in order to establish pretext.

---

[15] "In a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call." Aka, 156 F.3d at 1294. Accordingly, the evidence here is insufficient to establish an inference of retaliation.

The record does not support the conclusion that Francis was "significantly better qualified" for the position of Management Analysis Officer than was Gail Allen. Both had substantial managerial experience. <u>Compare</u> Francis Resume <u>with</u> Allen Application. But, unlike Francis, Allen also had a college degree and the substantial insurance management experience sought in the job vacancy announcement. <u>See</u> #7779 Vacancy Announcement at 2. "[C]ourts must defer to the employer's decision as to which qualities required by the job (substantive v. managerial) it weighs more heavily." <u>Barnette</u>, 435 F.3d at 517 (citing <u>Stewart</u>, 352 F.3d at 429). In light of Francis's failure to show that he was significantly better qualified, there is no reasonable basis for concluding that the District's explanation is pretext for retaliation. Hence, the District is entitled to summary judgment on this claim as well.

## CONCLUSION

For the foregoing reasons, the Court will grant the District's motion for summary judgment. A separate order will be filed on this date.


_____/s/_____
JOHN D. BATES
United States District Judge

Date:   August 18, 2010